## BARRIE, Appellant, v. UNITED RAILWAYS COMPANY OF ST. LOUIS, Respondent.

**St. Louis Court of Appeals, May 14, 1907.**

1. **FRAUDULENT CONVEYANCES: Corporations: Stockholders.** Where a solvent corporation acquired the stock and assets of an insolvent one, and in the transaction certain stockholders of the latter exchanged their stock for stock in the former, although such stockholders might be liable to account to the creditors of the insolvent company, the purchasing company would not be affected by it provided it acquired the stock of the other for value in good faith.

2. ————: ————: **Identity of Management: Presumption.** Where the chief officers and directory of two corporations were practically identical and one acquired the assets and stock of the other, the latter being insolvent, the presumption is that the transaction was fraudulent and the assets should be held for the benefit of the creditors of the insolvent company, but this presumption might be overcome by clear and convincing proof that the officers and directors acted with impartiality and fairness.

3. ————: ————: **Trust Fund.** The doctrine that the property of a corporation is a trust fund for the benefit of creditors does not give the creditors a lien upon the property; it means only that the corporate debts must be paid before there can be a distribution of its property to the stockholders; it does not prevent a transfer of corporate property in good faith for a valuable consideration.

4. **EVIDENCE: Tabulated Statements: Hearsay.** In an action against a corporation seeking to charge certain assets in possession of the corporation with the payment of a judgment held by plaintiff against another corporation which was insolvent, from which such assets had been acquired, a statement of the assets and liabilities involved in the transaction whereby such assets were acquired purporting to be compiled from the books of the two corporations by the officers, was mere hearsay and not admissible in evidence; the books themselves should be produced by the officers having them in charge.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

REVERSED AND REMANDED.

*Marion C. Early* for appellant.

(1) Where all the directors in one corporation are directors in another, and assume to represent both in transactions in which their interests are opposed, the substantial elements of a contract are wanting, a breach of trust is obvious, since the same persons cannot serve two antagonistic masters. And when under such circumstances one of said corporations becomes insolvent and all its assets are conveyed to the other, these directors participating in the transaction, it is prima facie fraudulent. Noyes on Intercorporate Relations, pp. 194, 195; Insurance Co. v. Transportation Co., 13 Fed. 518; Railroad v. Evans, 66 Fed. 810; Railroad v. Bell, 44 Cal. 398; Couse v. Powder Co., 33 Atl. 297; Bank v. Alabama Sanitarium, 103 Ala. 358; Montgomery Web. Co., v. Dienelt, 133 Pa. St. 585; Sweeney v. Refining Co., 30 W. Va. 433; Bank v. Judah, 8 Conn. 145; Levis v. Gro. Co., 38 S. W. 755. (2) In Missouri and some other jurisdictions, it has been held that the mere fact that some of the persons who compose the board of directors may also be directors in another corporation will not of itself render transactions between them void, but even in these jurisdictions such transactions are subject to a severe judicial scrutiny and upon the least appearance of unfairness will be set aside. They must act in the utmost good faith. Hutchinson v. Sutton Mfg. Co., 57 Fed. 998; Orchard Co. v. Hanley, 15 Utah 506; Alexander v. Williams, 14 Mo. App. 13; Kitchen v. Railway, 69 Mo. 224; Thompson on Corp., secs. 4009, 4022, 4079, 4087, 8502; Iron Co. v. Richmond, 129 U. S. 643; Railroad v. Railroad, 109 U. S. 522; R. S. 1899, sec. 1281. (3) A consideration of the pleadings and evidence in this case conclusively establishes that the transaction here in question, whereby all the assets and property of the St. Louis Transit Company were absorbed by

the United Railways Company, was a mere voluntary reorganization and readjustment of the affairs of the two companies and to make the same effective it was essential that every interest, including unsecured creditors, assent thereto, and in the absence of such assent the entire transaction is void. Clark and Marshall on Corp., sec. 345a, page 1011 and cases cited; Railroad v. Paul (C. C. A.), 93 Fed. 878. (4) When one corporation acquires all the assets of another corporation, issues its stock in exchange for the stock of the old company, and the old company ceases to be a going concern and the new company continues the business, the new company receives the assets of the old company burdened by its liabilities. Such arrangement has the effect of distributing assets of the old company among its stockholders, to the exclusion of creditors. This cannot be done. The new company will be held by operation of law to have assumed and agreed to pay the debts of its vendor, including a judgment subsequently recovered against it in an action for negligence which was pending at the time of the transfer. That the absorbed company was insolvent is immaterial. Berthold v. Lumber Company, 91 Mo. App. 333; Burge v. Railroad, 100 Mo. App. 460; Railroad Co. v. Lee, 84 S. W. 332; Grinnell v. Gas Co., 112 Mich. 70; Capsule Co. v. Isaacs, 55 N. E. 836; Wilson v. Aeblin, 72 N. Y. Supp. 150; Railroad v. Jones, 29 Ind. 465; Thompson v. Abbott, 61 Mo. 176; Railroad v. Boney, 117 Ind. 50; Meyer v. Johnston, 64 Ala. 656; Railroad v. Ashling, 160 Ill. 373; Dodson v. Railroad, 77 Md. 489; 10 Cyc., pp. 303-308; Thompson on Corp., secs. 405, 8231, 8240-41; Cook on Corp. (4 Ed.), sec. 897.

*Boyle & Priest* and *G. T. Priest* for respondent.

(1) The doctrine that the property of a corporation is a trust fund for the benefit of its creditors and the payment of its debts, does not prevent a transfer of its property made in good faith for a valuable consider-

ation, and when the transfer is made and the consideration is fair and just, a creditor of the transferring company cannot be heard to complain against the transferee company. Such a transaction is not a conveyance in fraud of creditors. And in no instance, whether the transfer be with or without consideration, and in fraud of creditors, will the transferee company be held to an amount greater than the assets taken over. Noyes on Intercorporate Relations, p. 191, par. 123; Powell v. Railroad, 42 Mo. 63; Shoe Co. v. Prickett, 84 Mo. App. 94; Fogg v. Blair, 133 U. S. 534; Railroad v. Evans, 66 Fed. 809; Collins v. Iron Co., 150 U. S. 371.    (2) The courts all hold that the assumption of the liabilities of one corporation by another is sufficient consideration to make the transfer of assets valid and *a fortiori* it is so when the liabilities assumed largely exceed the assets. Benesh v. Insurance Co., 103 Iowa 465; Baker v. Harpster, 42 Kan. 511; Fernschild v. Brewing Co., 154 N. Y. 667.

STATEMENT.—To construct, maintain and operate street railways, and to acquire, hold, possess and enjoy property rights, privileges and franchises of any street railway, the St. Louis Transit Company, with a capital stock of three thousand dollars, was, on March 2, 1899, incorporated under the laws of this State to continue as a corporation for fifty years. The Central Traction Company, of St. Louis was incorporated under the laws of this State, on March 10, 1898, with a paid-up capital of one hundred thousand dollars divided into one thousand shares at a par value of one hundred dollars each. It was to continue for fifty years. Its purposes were to construct or acquire by purchase, lease or otherwise, and to maintain and operate by any and all kinds of motive power, street railways for public use in the conveyance of persons and property, in the city and county of St. Louis, Missouri. On July 10, 1899, the name of the Central Traction Company of St. Louis

was changed to United Railways Company of St. Louis, and the capital stock of the company increased to forty-five million dollars, twenty-five million of common and twenty million of preferred stock, and in the same year it acquired by purchase all but one of the street railways in the city of St. Louis. The capital stock of the Transit Company was also increased to twenty million dollars. On September 13, 1899, the United Railways Company leased to the Transit Company, for a term of forty years, all the lines of railway it had acquired in the city and county of St. Louis. The Transit Company exchanged seventeen million two hundred and sixty-one thousand dollars of its stock for an equal amount of the common stock of the United Railways Company, plus eleven dollars cash per share, that is, the Transit Company gave seventeen thousand two hundred and sixty-one shares of its stock, of the par value of one hundred dollars per share, for seventeen thousand two hundred and sixty-one shares of the common stock of the United Railways Company, of the par value of one hundred dollars per share, and one million eight hundred and ninety-eight thousand eight-hundred and thirty-one dollars cash. This cash went into the treasury of the Transit Company and became its working capital. The principal burdens assumed by the Transit Company under the lease, are contained in the following provisions of the lease contract:

"1. That is, Transit Company, shall and will during the continuance of this lease, at its own proper cost and expense, and without deduction from the rent herein provided to be paid, maintain, operate, work, use and run, and keep in public use the said demised railways, in the same manner as United Railways, as the owner or lessor thereof, is now, or at any time hereafter may be required to do. And Transit Company shall and will, at its own proper cost and expense and without deduction from the rent herein provided to be paid, at all times, during the continuance

of this lease, maintain, operate and keep the railways, property and premises hereby demised, and every part of the same, in good repair, working order and condition, and supplied with rolling stock and equipment so that the business of said demised railways shall be increased and developed. And Transit Company hereby agrees and promises to and with Railways Co. that it, Transit Company, shall and will at its own proper cost and expense, and without deduction from the rent aforesaid, from time to time, during the term aforesaid, do, or cause to be done, to and upon the said demised premises and railways, any and all repairs and replacements and any and all additions thereon and improvements which may be reasonably required for the purposes aforesaid, and provide thereon such new and additional rolling stock, equipments and other appliances, as shall and may be reasonably required for the purposes aforesaid; and Transit Company shall and will use all reasonable efforts to maintain, develop and increase all the business of the railways hereby demised.

"Transit Company shall and will keep a complete and accurate record of all additions, acquisitions, betterments and improvements made by it upon said demised premises and property and the amounts of money expended therefor, and shall, from time to time, file the same with Railways Company, and, thereupon, when requested by resolution of the Board of Directors of Transit Company, Railways Company will deliver to Transit Company, or its order, any of its unissued first general mortgage bonds at par on payment for the money so expended, which it would be authorized to use, for the same purpose under the terms and conditions of the mortgage securing said bonds; or, in payment for said sums of money so expended by Transit Company, Railways Company will deliver at par, when requested, as aforesaid, to Transit Company any of its unissued preferred or common stock.

"And Transit Company will indemnify, save and keep harmless, during the continuance of this lease, United Railways from all costs, charges and expenses arising from the management and operation of said railways, and all matters incident thereto.

"2. That Transit Company shall pay to Railways Co. a net annual rental of five dollars ($5.00) per share upon all the preferred stock of Railways Company, now outstanding or which may hereafter be issued by Railways Company with the consent of Transit Company; said rental shall be payable quarterly on the tenth days of January, April, July and October during each and every year hereafter for the full period of this lease, provided, however, that the first quarterly payment shall be made on the tenth day of April, 1900. Payments of the rental herein provided for shall be made at the office of the Transit Company in the city of St. Louis or at the agency of the Transit Company in in the city of New York, either or both, as Transit Company shall, from time to time, determine.

"3. That in addition to the rental provided to be paid by Transit Co. in paragraph two of this lease, Transit Co. shall pay to the United Railways the further sum of one thousand dollars ($1,000) per annum, for the purpose of defraying the expense of maintaining the corporate existence of the railways and traction companies connected with, or interested in, the properties and franchises herein mentioned, which sum shall be paid semiannually in equal installments at the times and at the place or places hereinabove provided for the payment of the rental.

"4. That in addition to the amounts hereinabove provided to be paid by Transit Company to United Railways in paragraphs two and three hereof, Transit Company hereby assumes and agrees to pay all of the floating debts of United Railways when and whenever the same may become due and payable.

"5.   That Transit Company shall and will also during the continuance of this lease, pay all taxes and assessments and water rents which may be assessed upon the real estate, personal property, franchises, capital stock, business, rental, income, dividends and indebtedness of United Railways, or any of the lines of railways or property leased or operated by it.

"6.   That Transit Company shall and will also pay the interest accrued, and to accrue, as the same becomes respectively due and payable, on all the bonds heretofore issued, and now outstanding, by Railways Company, or any of the subordinate companies whose property and franchises Railway Company has acquired, said bonds being as follows:

"The Missouri Railroad Company five per cent bonds of date February 27, 1896, due March 1, 1906, seven hundred thousand dollars ($700,000).

"The Forest Park, Laclede & Fourth Street Railroad Company seven per cent bonds, of date May 1, 1885, due June 1, 1900, ninety-two thousand and one hundred dollars ($92,100).

"The Lindell Railway Company five per cent bonds, of date August 1, 1891, due August 7, 1911, one million five hundred thousand dollars ($1,500,000.)

"The Compton Heights, Union Depot & Merchants Terminal Railroad Company six per cent bonds, of date July 1, 1893, due July 1, 1913, one million dollars ($1,000,000).

"The Taylor Avenue Railway Company six per cent bonds, of date July 1, 1893, and due July 1, 1913, five hundred thousand dollars ($500,000).

"The Union Depot Railroad Company six per cent bonds, of date October 1, 1890, due October 1, 1910, seven hundred and ninety-one thousand dollars ($791,000).

"The Union Depot Railroad six per cent bonds, of

date June 1, 1893, due June 1, 1918, two million four hundred and nine thousand dollars ($2,409,000).

"The Mound City Railway Company (road subsequently acquired by Union Depot Railway Company) six per cent bonds, of date October 1, 1890, due October 1, 1910, three hundred thousand dollars ($300,000).

"The Jefferson Avenue Railroad Company five per cent bonds, of date November 2, 1895, due November 2, 1905, two hundred and seventy-seven thousand dollars ($277,000).

"The People's Railway Company (property now owned by St. Louis Traction Co.) six per cent bonds, of date May 1, 1882, due May 1, 1902, one hundred and twenty-five thousand dollars ($125,000).

"The People's Railway Company (property now owned by St. Louis Traction Co.) seven per cent bonds, of date May 1, 1886, due May 1, 1902, seventy-five thousand dollars ($75,000).

"The Southern Electric Railroad Company six per cent bonds, of date May 1, 1884, due May 1, 1904, one hundred and sixty-four thousand dollars ($164,000).

"The Southern Electric Railroad Company six per cent bonds, of date May 6, 1890, due May 1, 1915, three hundred and thirty-six thousand dollars ($336,-000).

"The Southern Electric Railroad Company five per cent bonds, of date August 1, 1896, due August 1, 1916, two hundred thousand dollars ($200,000).

"The Cass Avenue & Fair Grounds Railway Company five per cent bonds, of date July 1, 1892, due July 1, 1912, one million eight hundred and thirteen thousand dollars ($1,813,000).

"The Citizens' Railway Company six per cent bonds of date July 1, 1887, due July 1, 1907, one million five hundred thousand dollars ($1,500,000).

"The United Railways Company of St. Louis first general mortgage four per cent bonds of date September

20, 1899, due July 1, 1934, twenty-three million dollars ($23,000,000) and Transit Company shall and will also pay all interest that shall accrue upon all further issue of said first general mortgage bonds issued by Railways Company, under the terms and conditions of the said mortgage deed of indenture securing same.

"7. That Transit Company shall and will, at all times, keep the property of Railways Company insured against loss by fire, paying premiums therefor from its own funds, and will, at the expiration of this lease and contract, yield and deliver up the hereby demised railways and properties and their appurtenances in the same good order and repair as the same are now in, or may be put in during the hereby demised term (reasonable wear and tear excepted), excepting any property sold in accordance with this agreement and contract.

"8. That Transit Company shall and will, during the continuance of this lease, apply all net surplus earned by it over and above the six per cent annual dividend upon the $20,000,000 of capital stock which Transit Company is now authorized to issue, or so much thereof as may from time to time be outstanding, to the betterment, improvement, or extension of the property or railway lines now owned or which may hereafter be acquired by Railways Company, or to the redemption payment or retirement of the mortgage indebtedness of Railways Company or of its subordinate companies. In case Transit Company shall purchase out of said surplus earnings any of the underlying bonds issued by any of the subordinate companies, whose property, franchises or stock has been acquired by Railways Company, Transit Company shall have the same right to use the first general mortgage four per cent bonds, which Railways Company, under its mortgage, is authorized to receive in exchange from said underlying bonds of said subordinate companies, in the same manner, and to the same extent as Railways Company would have the right

under said mortgage to use the same, the Railways Company shall and will do all things requisite or necessary on its part to be done to carry this provision into full force and effect.

"9. That Transit Company shall and will apply all moneys received by it from Railways Company at the time that this lease goes into effect, save and except what may be necessary to meet current liabilities, including interests accrued upon all mortgage indebtedness, to the improvement of the premises hereby demised and shall make like disposition of all moneys that Transit Company may subsequently receive from Railways Company through the sale of property that may become useless in the conduct of the business of Railways Company; and Railways Company shall and will turn over to Transit Company all moneys of every character in its possession, or to which it may be entitled, at the time that this indenture goes into effect, and all other moneys that it may subsequently become possessed of from any source whatever, during the term of this lease.

"10. That it is the purpose and understanding of the parties hereto that these presents shall go into effect immediately upon their execution and delivery, and all the rights and liabilities of the parties, hereto, as herein assumed, covenanted for and agreed to, shall upon due execution and delivery hereof, become fixed and ascertained, United Railways Company turning over all assets of every character to Transit Company, and Transit Company assuming all liabilities of every character of United Railways."

The Transit Company encountered a strike in the summer of 1901, which wiped out its cash then in the treasury (one million nine hundred thousand dollars) and caused an additional direct loss estimated at two million two hundred and fifty thousand dollars. Under the terms of the lease, it had expended about eight mil-

lion dollars in betterments and improvements, for which it had been paid in the bonds and stocks of the United Railways Company, as was agreed and stipulated in the lease. By September, 1901, the Transit Company owed about six million dollars. To provide for the payment of this indebtedness, the Transit Company executed its trust notes and also a trust agreement with the Mercantile Trust Company of St. Louis, whereby it pledged two million eight hundred and seventy-six thousand dollars par value United Railways Company four per cent general mortgage bonds, and four million eight hundred and ninety-three thousand five hundred dollars par value United Railways five per cent preferred stock, to secure the payment of five million seven hundred and seventy-six thousand dollars of the five per cent trust notes to mature November 1, 1904. In September, 1904, these collaterals had so depreciated in value that they did not equal the notes for the payment of which they were pledged, by about one million dollars. Early in the year 1903, the Transit Company was put to great straits and determined to issue twenty million dollars of bonds, called refunding and improvement bonds, to be payable April 1, 1923, and on April seventeenth issued them. To secure these bonds it entered into an indenture of trust with the Mercantile Trust Company and deposited as collateral under said trust, $2,877,000 par value United Railways four per cent general mortgage bonds, $5,324,700 par value United Railways preferred stock, $17,261,300 par value of the common stock of the United Railways Company, and a mortgage upon its leasehold, to secure its contemplated issue of bonds. Of this issue of bonds, the Transit Company was able to dispose of but eight million dollars worth, and the corporation was unable to meet its obligations maturing November 1, 1904, or make any disposition of the remainder of its twenty million dollars issue of bonds by which to meet said obligations. On September 27, 1904,

Brown Bros. & Co. Syndicate, the Transit Company and the United Railways Company entered into a tripartite agreement, which recited the then financial condition of the Transit Company and provided in substance, that the Transit Company should make an issue of five per cent twenty-year gold bonds to be called improvement bonds, to the amount of ten million dollars, to be guaranteed by the United Railways Company, the guarantee to be secured by a mortgage upon all the property of the United Railways Company, subject to mortgages then existing. It was agreed that the Transit and the United Railways Company, when the Transit Company was requested to do so by the United Railways Company, the Transit Company would give a conveyance of the lease of September 30, 1899, provided the United Railways Company would, at the same time, release and acquit the Transit Company from the lease and covenants of the lease. The Transit Company further agreed to cause the eight million dollars of its refunding and improvement bonds outstanding, together with the portion unused, to be released, and the indenture of trust of June 17, 1903, to be cancelled and to cause the holders of the eight million dollars of refunding and improvement bonds to exchange their holdings for a like amount of improvement bonds to be issued and guaranteed by the United Railways Company. The Transit Company further agreed to sell the collaterals deposited under the trust agreement of November 30, 1901, and June 17, 1903, as well as two million dollars of the proposed improvement bonds, to Brown Bros. & Co. Syndicate, and further agreed in the sale of said stocks and bonds, that the Syndicate should provide seven million dollars of preferred stock of the United Railways Company to be deposited for the use and benefit of the United Railways Company upon the terms agreed upon between the company and the Syndicate. The Syndicate and the Transit Company agreed as follows: The Transit Com-

pany to sell the Syndicate two million dollars of its proposed improvement bonds at eighty-five cents on the dollar, and eight million two hundred and twenty-seven thousand three hundred dollars par value of preferred stock of the United Railways Company; two million eight hundred and seventy-seven thousand dollars par value of four per cent general mortgage bonds of the United Railways Company, and seventeen million two hundred and sixty-one thousand dollars par value of common stock of the United Railways Company, in consideration of five million three hundred thousand dollars, making in payment the sum total for the securities sold, seven million dollars. Of this sum the Transit Company agreed to expend for the purpose of discharging the notes due November 1, 1904, six million seven hundred and eleven thousand dollars, the remaining two hundred and eighty thousand to be paid upon the order of the Transit Company. The Syndicate further agreed to cause seven million dollars of the preferred stock of the United Railways Company to be acquired by it under the agreement to be deposited with the Mercantile Trust Company for the use and benefit of the United Railways Company. The Syndicate and the United Railways Company agreed as follows: The United Railways Company agreed to sell the Syndicate seven million six hundred and fifty-two thousand five hundred dollars par value common treasury stock of the United Railways Company. When requested by the Syndicate to demand the surrender of the lease of September 30, 1899, and thereafter to operate the road on its own account, to guarantee the payment of the ten million dollars of improvement bonds to be issued by the Transit Company and to pay all the debts of said company at the time of the surrender of the lease, for labor, materials or supplies furnished the Transit Company. The Syndicate agreed to purchase all the sureties deposited to secure the trust notes of the Transit Company, and two

million dollars of the improvement bonds of the proposed issue of ten million, and further agreed, upon coming into possession of the said securities of the Transit Company, to deposit with the Bank of Commerce of St. Louis seven million dollars par value preferred stock of the United Railways Company for the use of said company and to be sold by the Syndicate for the company, upon such terms and conditions as the company saw fit. The agreement was carried out and the Transit Company transferred to the Syndicate,

> $8,227,300 United Railways preferred stock.
>
> 2,988,000 Par value four per cent United Railways general mortgage bonds.
>
> 2,000,000 Par value twenty-year improvement bonds.
>
> 17,261,300 Par value United Railways common stock.

in consideration of $7,000,000. Of this sum $6,711,000 went to the Mercantile Trust Company to pay the notes of the Transit Company and to release the stocks sold to the Syndicate. The balance, $289,000, was paid over to the Transit Company or its president. The United Railways Company transferred $7,652,500 par value of common stock to the Syndicate, guaranteed the payment of the Transit Company's improvement bonds, and assumed the payment of all the Transit Company's debts for labor, materials and supplies. The Syndicate deposited $7,000,000 par value United Railways preferred stock with the Bank of Commerce for the use and benefit of the United Railways Company, so that the Syndicate really acquired on its behalf, and as consideration for the $7,000,000 paid,

> $2,000,000 Par value of Transit Company improvement bonds.
>
> 2,988,000 Par value United Railways four per cent general mortgage bonds.

7,652,500 Par value United Railways common stock.

1,227,000 Par value United Railways preferred stock.

and also what remained in its hands of the $17,261,300 United Railways common stock, after the exchange for Transit stock, or about $6,664,124 par value of the United Railways common. The Transit Company surrendered its lease to the United Railways Company, took up its $8,000,000 of refunding and improvement bonds by exchanging for them a like amount of improvement five per cent twenty-year bonds, and then cancelled the entire issue of $20,000,000 of refunding and improvement bonds and sold $2,000,000 of its five per cent bonds to the Syndicate, at eighty-five cents on the dollar. The United Railways Company guaranteed the payment of the Transit Company $10,000,000 five per cent twenty-year improvement bonds and mortgaged its property to secure their payment, released the Transit Company from all its obligations as lessee, and assumed to pay and did pay its debts for labor, supplies and materials.

Murray Carleton, president of both the Transit and the United Railways Company, testified the terms of the tripartite agreement were carried out to the letter, and about a month after the execution of the agreement, at the request of the Syndicate, made on the United Railways Company, the latter demanded of the Transit Company a surrender and reconveyance of the leased property, and on October 29, 1904, the Transit Company made a conveyance of the leased property to the United Railways Company.

No itemized statement of the floating indebtedness of the Transit Company, nor of its assets (except bonds and stocks) is set out or tabulated in the tripartite agreement. It is stated in the agreement, that on August 1, 1904, the company had a specific indebtedness of $1,-

665,155.17, which it was estimated the surplus earnings of 1904 would reduce to $935,000. Carleton also testified that he directed Mr. Atkins, secretary of both companies, to make out tabulated statements of all the United Railways Company had received from the Transit Company and of all the liabilities the United Railways Company had assumed under the terms of the agreement; that these statements were made and he had them in his possession and was satisfied they were correct. Over the objection of plaintiff, the statements were admitted in evidence. They show the liabilities assumed to be as follows:

| | |
|---|---:|
| "St. Louis Transit Company improvement, 20-year 5 per cent Gold Bonds—Guaranteed by United Railways Company .... .... .............. | $10,000,000.00 |
| Bills payable, .... .... ......... .... | 735,221.00 |
| Accounts Payable—Audited Vouchers, .. .. ...... .. ...... .... | 324,858.11 |
| Unclaimed Wages, .. .. .... .... | 4,210.40 |
| Trust Fund Certificates—Employees' Savings Deposit, .... ........ .. | 6,445.00 |
| Employees' Badge Deposit, .. .. .. | 288.65 |
| Outstanding Bank Checks, .. .. .. | 402.55 |
| Matured Bonds and Coupons, .... | 105,380.00 |
| Dividend Accrued on United Railways Company Preferred Stock,. | 54,096.66 |
| Interest Accrued on Funded Debt,.. | 627,860.00 |
| Outstanding Tickets, .... .... .... | 14,987.50 |
| Sundry Creditors, ...... .. .... .. | 14,309.73 |
| Sundry Accrued and Reserved Accounts, .... .... .... .... | 33,422.94 |
| Total Liabilities Assumed.. .. | $11,921,482.54 |

And the assets received as follows:

"Preferred Capital Stock of United
Railways Company of St. Louis
(70,000 Shares) held by the Na-
tional Bank of Commerce in St.
Louis, Trustee, ..............$ 7,000,000.00
Capital Stock of the Louisiana Pur-
chase Exposition Company, Par
Value, .... ...... ...... ....   210,000.00
Securities due from the United Rail-
ways Company of St. Louis for
Construction and Equipment Ex-
penditures, .... .... ... ....  1,118,876.57
Material and Supplies on hand, .. ..   286,614.47
Cash, .... .... .... .... .... ....   614,015.25
Brown Brothers & Co. Syndicate
Managers, .... .... .... ....  1,224,000.00
Bills Receivable, .... ...... .... ..    86,556.73
Accounts Receivable, ..... .... ....    48,247.07
Conductors Collections, .... .. ....       559.50
City of St. Louis, .... .... .... ....     2,007.33
United States Government — P. O.
Dept., ...... .... .... .... ..    11,044.40
The Fidelity & Casualty Co. of New
York, .... .... .... ..... ....    75,000.00
Cash on Deposit for Payment of Ma-
tured Bonds and Coupons, ....   105,380.00
Sundry Debtors, .... .... ...: ....    17,206.92
Sundry Accounts Paid in Advance, ..    82,010.53
                                    ——————————
                                   $10,673,618.77
Excess of Liabilities Over Assets Ac-
quired by the United Railways
Company of St. Louis, October 31,
1904, upon Surrender of Transit
Company's lease, .... .... .. $1,247,863.77."

The assets are tabulated at their par value; if tabu-
lated at their market value, or at what the evidence

tended to show was their market value at the time, the excess of liabilities assumed and paid by the United Railways Company over the assets received amounted to several million dollars.

On February 1, 1900, plaintiff was struck and injured by a street car operated by the St. Louis Transit Company, on one of its leased lines, and sued the Transit Company, in the St. Louis Circuit Court, to recover damages caused by said injury; and in said suit, on November 10, 1904, recovered a judgment against the Transit Company for twelve hundred and fifty dollars damages and one hundred and twelve dollars and sixty cents costs laid out and expended. This judgment is in full force and effect. An execution was issued on the judgment and returned *nulla bona.* The action is in the nature of a bill in equity and seeks to charge the assets received by the United Railways Company from the Transit Company, under the tripartite agreement of September 27, 1904, with the payment of plaintiff's judgment recovered against the Transit Company November 10, 1904. The petition also charges, in substance, that the United Railways Company, on October 31, 1904, without paying anything therefor, absorbed and took over to itself all the assets of the Transit Company and from that time on continued to be the successor of the Transit Company in the operation of street railways in the city of St. Louis; and also alleges that the funds and assets of the Transit Company were held in trust by the United Railways Company for the payment of the debts and liabilities of the Transit Company.

The answer is a lengthy one. It contains a copy of the lease and of the several agreements, conveyances, etc., mentioned and referred to in the foregoing statement of facts, alleges good faith in all of said transactions, and that it paid a valuable consideration for the

assets transferred to it under the tripartite agreement, and for the surrender of the leasehold.

The evidence of Murray Carleton shows that after October 31, 1904, the Transit Company went out of business and had no assets whatever, and from that date the United Railways Company has operated all the property covered by the lease.

It was admitted by defendant that under the terms of the tripartite agreement, one hundred and sixty-six thousand six hundred and thirty-one shares of Transit Company stock (all that were issued and outstanding but about six thousand shares) were exchanged for United Railways common stock at the rate proposed in said article of agreement, and that the stock thus acquired by the Syndicate was converted to the treasury of the United Railways Company as per agreement. It appears from the evidence that all the stock of the United Railways Company issued was issued directly to the subscribers of the stock, except that which was delivered to the Transit Company in payment of improvements and betterments made by that company; it also appears that the shareholders owning the seventeen million two hundred and sixty-one thousand three hundred dollars of common stock exchanged the same with the Transit Company on the basis hereinbefore stated, that is, one share of United Railways Company stock, plus eleven dollars in cash for one share of Transit Company stock.

In answer to the question, if the Transit Company was not organized by the men in control of the United Railways Company for the purpose of operating all the property of the United Railways Company, Carleton answered, "No, sir. It was used for that purpose." The evidence shows that the board of directors of both companies consisted of eleven members and that ten of the members of each board were identical; that the president of one of the companies was also president of the

other, and the secretary and treasurer of one was also secretary and treasurer of the other. Carleton testified he did not know all the stockholders in the two corporations; that their numbers were thousands in both corporations and were probably not the same for one man might have stock in one and not in the other and so on. On his cross-examination, Carleton stated the following:

"Q. Mr. Carleton, do you know, in a general way, as to the concurrent ownership of stock in the United Railways Company and in the St. Louis Transit Company from 1900 forward? A. I don't know that I clearly comprehend your question, Judge.

"Q. How far, do you know, was there an identity of stockholders in the St. Louis Transit Company and the United Railways Company after the organization of those companies? A. Well, in a general way, I would say that, while some of the stockholders might have been shareholders in both companies in a general way, they were very dissimilar and a different class of stockholders in one company from the other company. The holders of Transit Company stock were not holders of the preferred stock of the United Railways Company and vice versa.

"Q. Now, up to the date of this tripartite contract there had been no common stock of the United Railways Company issued except that which was held by the St. Louis Transit Company. A. That is correct.

"Q. And the preferred stock of the United Railways Company was regarded as an investment security, wasn't it?

"Objected to.

"Objection overruled; to which ruling of the Court counsel for the plaintiff then and there duly excepted.

"A. It was; as I testified earlier, there were eleven thousand five hundred shares or eleven million five hundred thousand dollars; about eleven thousand shares of

it were exchanged earlier really on that basis when the properties were acquired."

Witness also testified that the people holding the eleven million dollars of United Railways preferred stock never became interested in the Transit Company; that in September and October, 1904, voting trust certificates (representing the common stock of the United Railways Company which was deposited as collateral security) were selling for about eighteen dollars per share. Witness also testified that the stockholders of both companies were consulted in respect to the making of the deed of trust of June 17, 1903, to secure the issue of twenty million dollars Transit Company bonds, and after much moral persuasion gave their consent thereto, and testified that it was understood between Brown Bros. & Co. Syndicate, before the tripartite agreement was entered into, that the stockholders of the Transit Company would be permitted to exchange their holdings for United Railways Company's stock, at the rate of five shares of Transit for two of United Railways Company common. Witness further testified that before the agreement was made he did all in his power to sell the bonds of the Transit Company and raise funds to meet the obligations of the company maturing on November 1, 1904, but was unable to do so; that in the year 1903, it became necessary for the Transit Company to expend large sums of money for betterments and improvements in order to be ready for the increased traffic of the year of the Louisiana Purchase Exposition (1904); that the United Railways Company had exhausted its bond issue and its preferred stock had all been issued and only the common stock remained and that had practically no market value; that in order to raise money it was agreed that some real estate owned by the United Railways Company, for which it had no use, might be sold by the Transit Company and the proceeds used by it; that the land was sold for three hundred thousand

dollars and the money turned into the treasury of the Transit Company and used in improvements.

Mr. Cella, who was a director of the Transit Company but not of the United Railways Company, testified that he told Judge Priest (Judge Priest being the general counsel of both companies), in September, 1904, that he would take a million dollars of the Transit Company's bonds and do his share to aid the company to meet its trust notes of five million seven hundred and seventy-six thousand dollars, maturing November 1, 1904; that he voted for an acceptance of the tripartite agreement and thought the deal a good one for the holders of Transit Company stock.

It is shown by the evidence that suits were pending when the tripartite agreement was entered into and others have since been brought against the Transit Company, and that these suits have been defended at the expense of the United Railways Company; that the United States Fidelity & Guaranty Co. had become surety on appeal bonds of the Transit Company, and the United Railways Company had given its bond of indemnity to the surety company. The shares of Transit Company stock that came over to the United Railways Company under the tripartite agreement were converted into certificates in the name of the United Railways Company and passed into its treasury. The court found the issues for defendant. Plaintiff appealed.

BLAND, P. J. (after stating the facts.)—1. The agreement between the Syndicate and the United Railways company provides, that the Syndicate should undertake to procure the exchange of the United Railways common stock for Transit stock and when the latter was acquired by the Syndicate it should turn it over to a trustee for the benefit of the United Railways Company. This stipulation formed a part of the consideration of the contract between the United Railways Company and the Syndicate, wherein the latter com-

pany agreed to issue, and did issue, to the Syndicate seven million six hundred and fifty thousand dollars par value of its common stock, in consideration of which the Syndicate turned over to the United Railways Company seven million dollars par value of the preferred stock of the United Railways Company and about one hundred and sixty-six thousand six hundred and thirty-one shares of the Transit Company stock acquired by the exchange. The market value of the United Railways common stock at the time of the exchange, according to the evidence of Mr. Carleton, was about eighteen dollars per share. Taking the rate of exchange of the United Railways common for Transit stock (two for five) the Transit was worth about seven dollars and twenty cents per share, and the value of the one hundred and sixty-six thousand six hundred and thirty-one shares turned over by the Syndicate to the United Railways Company would be about $1,199,000. This calculation is based upon the assumption that United Railways common was worth eighteen dollars per share at the time, as testified to by Mr. Carleton, and not upon evidence of the market value of Transit stock, if it had any, for there is no evidence in the record that it had a market value. If the stock had a value, the United Railways Company should be charged with it. Possibly the stockholders who exchanged it for United Railways common are liable to account to the creditors of the Transit Company for what they received by the exchange but they are not parties to this suit, and the United Railways Company is not concerned in any controversy that may arise between the creditors of the Transit Company and the stockholders who made the exchange, provided the United Railways Company, in good faith, paid value for the stock of the Transit Company. [Cora Hagemann v. Southern Electric Railroad Co., and United Railways Company of St. Louis, — Mo. —, 100 S. W. 1081.]

2. For the reason the directory and chief officers of both corporations are practically identical, the presumption is that the tripartite agreement, as between the two corporations, is fraudulent, and hence the assets acquired from the Transit Company by the United Railways Company, under said agreement, are held by the latter company in trust for the benefit of creditors of the former. But this presumption is not an irrebuttable legal presumption. It is a presumption of fact which may be overcome by clear and convincing proof that the officers and directors acted with impartiality and absolute fairness, so that no advantage was given one corporation over the other in the terms of, or in the performance of the contract. [Noyes on Intercorporate Relations, sec. 124, p. 195; Alexander v. Williams, 14 Mo. App. 13; Kitchen v. Railway, 69 Mo. 224; Sweeney v. Sugar Co., 30 W. Va. 443.]

3. The doctrine that the property of a corporation is a trust fund for the benefit of its creditors, does not go to the extent of giving the creditors a lien upon the property. It means only that the corporate debts must be paid before there can be a distribution of its property, or any part of it, to the stockholders, and that equity will follow the property into the hands of the stockholders, or of a fraudulent grantee and apply it, or its equivalent, to the payment of the corporate debts, in a proper proceeding for that purpose. But it does not prevent a transfer of the corporation's property made in good faith and for a valuable consideration. When this is done a creditor has no just ground to complain of the transfer, and in no instance where the transfer is, in fact or in law, fraudulent as to creditors will the transferee be held to account to them by an amount greater than the assets taken over under the fraudulent conveyance. [Noyes on Intercorporate Relations, p. 191, sec. 123; Powell v. Railroad, 42 Mo. 63; Railroad v. Evans, 66 Fed. 809; Hollins v. Brier-

field Coal & Iron Co., 150 U. S. 371; Kelly-Goodfellow Shoe Co. v. Prickett, 84 Mo. App. 94; Bank v. Iron Co., 97 Mo. 38, 10 S. W. 865.]

4. The admission of the tabulated statements of assets received and liabilities assumed by the United Railways Company as evidence was error. These statements were the baldest hearsay; presumably, they were taken from the books of the two corporations. The books themselves should have been produced by the officer having them in charge. We cannot consider these tabulated statements as evidence, nor can we assume the role of experts and fix the value, if any, of the Transit Company's leasehold, as we are asked to do by the plaintiff. In this state of the record, the evidence is wholly insufficient to enable us to pass upon the merits of the controversy.

The judgment is reversed and the cause remanded for retrial. *Goode, J.,* concurs in reversing the judgment and remanding the cause for the reason stated in paragraph 4 of opinion. *Nortoni, J.,* did not sit in the case.