MISTY MANAGEMENT CORPORA-
TION, a California Corporation,
Plaintiff-Appellee,

v.

James R. LOCKWOOD et al., Defendants,
Tri-Aviation Corporation, a California
Corporation, and Norman G. Doyle, De-
fendants-Appellants.

MISTY MANAGEMENT CORPORA-
TION, a California Corporation,
Plaintiff-Appellee,

v.

James R. LOCKWOOD et al., Defendants,
and First American Title Insurance Com-
pany of California, Defendant-Appellant.

MISTY MANAGEMENT CORPORA-
TION, a California Corporation,
Plaintiff-Cross-Appellant,

v.

James R. LOCKWOOD et al.,
Defendants-Cross-Appellees.

Nos. 74–1920, 74–2667 and 74–2668.

United States Court of Appeals,
Ninth Circuit.

June 23, 1976.

1206

George E. McGill (argued), Long Beach, Cal., for defendants-appellants.

J. Stephen Peek (argued), Reno, Nev., for plaintiff-appellee.

## OPINION

Before WRIGHT and SNEED, Circuit Judges, and WILLIAMS,* District Judge.

SNEED, Circuit Judge:

This case comes to us on appeal from a district court judgment setting aside the conveyance of a piece of real property known as Carson Hot Springs, from Misty Management Corporation (hereinafter Misty) to Tri-Aviation Corporation (hereinafter Tri-Aviation). The district court found that the conveyance in issue was fraudulent within the meaning of section 67d of the Bankruptcy Act, 11 U.S.C. § 107(d), and under the Nevada Fraudulent Conveyances Act. The transfer was therefore set aside pursuant to sections 67d and 70e of the Bankruptcy Act. First American Title Insurance Company (hereinafter First American), which acquired the deed to Carson Hot Springs through a rather complicated series of transactions, was denied a lien on the Hot Springs property after surrendering the property to Misty. First American was, however, awarded an unsecured claim against Misty in the amount of $162,500, the amount which it had paid for the property.

Appellants Tri-Aviation, First American, and Norman G. Doyle (who formed Tri-Aviation for the purpose of receiving Carson Hot Springs from Misty) appeal from that portion of the judgment which set aside the transfer of Carson Hot Springs. They argue that this suit was barred by the statute of limitations, and that in any event a number of the district court's findings of fact were clearly erroneous. First American also appeals from that portion of the judgment which denied it a lien on the Carson Hot Springs property. Cross-appellant Misty appeals from that portion of the judgment which awarded First American an unsecured claim against the Misty estate.

## I.

### Facts of the Case.

The events relevant to this case commenced in November 1963 when Winnifred, Walter, John and Betty Doyle obtained a $100,000 personal injury judgment against Don R. Langson. Very shortly thereafter, Langson formed Misty and transferred a number of assets to it. Norman G. Doyle was appointed the Doyles' agent for collection of their judgment. Doyle instituted a number of California and Nevada lawsuits naming both Langson and Misty, *inter alia,* as defendants, predicating Misty's liability on an alter ego theory.

On May 15, 1964, Dr. Thomas Wyatt deeded to Misty a piece of real property known locally as Carson Hot Springs. Wyatt was allowed to remain in actual possession of the property. The agreed purchase price of $375,000 remained largely unpaid, however, and Wyatt later began an action in the Nevada courts to cancel the sale to Misty. Although this action was ultimately unsuccessful, it remained pending in the Nevada Supreme Court in August, 1966 when Doyle met with representatives of Misty in an effort to settle the various suits against Langson and Misty.

Eileen Bates, a close friend of Langson, was president of Misty and record holder of all of its stock from the time of its incorporation until approximately May 5, 1966. By that time, she had signed the stock over to Frank Stilwell, another friend of Langson, and she and her codirectors had resigned. Stilwell became the new president of Misty. Meanwhile, a dispute between Langson and

---

* The Honorable Spencer M. Williams, United States District Judge for the Northern District of California, sitting by designation.

Bates arose concerning ownership of Misty. Bates claimed beneficial ownership of the stock and argued that her resignation and the stock transfer had been coerced.

In August 1966 a series of meetings took place, through which an attempt was made to settle both the Bates-Langson dispute and the Doyle claim against Misty. Stilwell has apparently agreed to execute a deed transferring Carson Hot Springs to Tri-Aviation, which had been formed by Doyle for receiving the property. After attempts to resolve the Bates-Langson dispute had failed on August 24, however, *Bates* (purportedly acting on behalf of Misty) executed a deed conveying Carson Hot Springs to Tri-Aviation on August 25, 1966.

In January 1967 Langson replaced Stilwell as Misty's president. On March 10, 1967, Misty filed a petition for reorganization under Chapter X of the Bankruptcy Act. In December 1969 this was converted into a Chapter XI arrangement proceeding. The Chapter XI proceeding was deemed to have commenced as of the filing date of the original Chapter X petition.

Meanwhile, in June 1967, Tri-Aviation obtained a $150,000 loan from James Lockwood, secured by a deed of trust on Carson Hot Springs. Lockwood demanded, as a condition of the loan, a title insurance policy without exceptions. There were, however, at least two potential clouds on Tri-Aviation's title to the property: (1) a *lis pendens* stating that Misty had filed a Chapter X petition alleging equitable ownership of Carson Hot Springs due to the transfer of that property without consideration; and (2) a *lis pendens* filed by Wyatt in connection with his efforts to recover title to the property. Appellant First American nevertheless issued a title insurance policy without exceptions, in return for an agreement whereby the Doyles would indemnify First American against losses suffered by reason of the policy's omissions.

Tri-Aviation subsequently defaulted on its loan payments. Lockwood foreclosed on Carson Hot Springs and purchased it at the trustee's sale. Lockwood commenced an unlawful detainer action in an effort to evict Wyatt from the property, but this action proved to be unsuccessful. Lockwood then demanded and received payment from First American on the title insurance policy. First American then obtained from Lockwood a deed to the property.

The complaint by Misty seeking recovery of Carson Hot Springs was filed on March 4, 1970. After trial, the district court concluded, *inter alia,* that the August 25, 1966 conveyance of Carson Hot Springs was made with actual intent to defraud Misty's creditors; that the transfer was without adequate consideration; that the Doyles and Tri-Aviation were not acting in good faith and were *in pari delicto* in the intention to hinder, delay, and defraud Misty's creditors; that Misty was rendered insolvent by the transfer; and that First American's actions constituted participation in a fraudulent scheme to place the property beyond the reach of Misty's creditors. The district court then concluded that the August 1966 transfer of Carson Hot Springs was voidable and should be set aside. First American, as subsequent title holder, was not permitted to retain the property or obtain a lien thereon due to its fraudulent involvement in a scheme to launder title to the property. After surrender of the property, however, First American was allowed to prove a claim against Misty for the amount of money that First American had paid Lockwood on the title insurance policy. The district court also concluded that the Doyle interests (through retention of the proceeds of the Lockwood loan) and Lockwood (through the proceeds of the title insurance) had no further claims to the property or against Misty.

## II.

### *The Statute of Limitations.*

The transfer in question occurred on August 25, 1966. Misty's Chapter X petition was filed on March 10, 1967 and was approved four days later. Pursuant to a district court order dated December 19, 1969, the proceeding was converted to one under Chapter XI, which was deemed to

have commenced as of the date of filing of the Chapter X petition. The instant lawsuit was filed on March 4, 1970. It is argued that, on these facts, this action to set aside was barred by the statute of limitations.

Proper resolution of this argument requires consideration of a number of interrelated statutes. Section 11e of the Bankruptcy Act, 11 U.S.C. § 29(e), provides in part that

[a] receiver or trustee may, within two years subsequent to the date of adjudication or within such further period of time as the Federal or State law may permit, institute proceedings in behalf of the estate upon any claim against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy.

Appellants contend that the two-year limitation within section 11e is made applicable to Misty's Chapter XI proceeding by section 302 of the Bankruptcy Act, 11 U.S.C. § 702, which provides in part that the provisions of Chapters I through VII of the Act "shall, *insofar as they are not inconsistent with or in conflict with the provisions of this chapter,* apply in proceedings under this chapter." (Emphasis added). Section 102 of the Act (11 U.S.C. § 502) uses similar language in applying Chapters I–VII to proceedings under Chapter X. Sections 102 and 302 provide further that the "date of adjudication" (from which the two-year period under section 11e is presumably to run) shall be the date of approval of a Chapter X petition (in this instance, April 14, 1967), or the date of filing of a Chapter XI petition, unless an adjudication in bankruptcy had already been entered.

Both Chapter X (section 261 of the Act; 11 U.S.C. § 661) and Chapter XI (section 391 of the Act; 11 U.S.C. § 791) contain, however, the following language limiting the expiration of relevant statutes of limitation:

[T]he running of all periods of time prescribed by this act in respect to the commission of acts of bankruptcy, the recovery of preferences and the avoidance of liens and transfers shall be suspended while a proceeding under this chapter is pending and until it is finally dismissed.

This court has previously given effect to the tolling provision of section 261 in *Davis v. Security National Bank,* 447 F.2d 1094 (9th Cir. 1971).

First American argues with some force that the tolling provisions of sections 261 and 391 should be inapplicable to the instant case. These provisions, it argues, serve to toll limitations during a Chapter XI proceeding only when such proceeding has been terminated and ordinary bankruptcy proceedings resume. In the absence of an abortion of the Chapter XI proceeding the ordinary two-year limitation period is applicable. Any other construction of the statutes, it is argued, would unfairly allow a Chapter trustee to refrain from asserting his rights for many years during the pendency of a Chapter proceeding. Our *Davis* decision, wherein we gave effect to the tolling statute in a suit brought after a Chapter X proceeding had been aborted, is said to be consistent with this interpretation.

We believe, however, that these contentions are foreclosed by the plain language of section 391, which draws no distinctions between ongoing Chapter XI proceedings and those which have been terminated. The two-year limitation is, in any event, adopted by section 302 only insofar as it is "not inconsistent with" Chapter XI proceedings. Since such a limitation is plainly inconsistent with the tolling provision of Chapter XI, the tolling provision must control. *See Davis v. Security National Bank, supra; Liman v. Bank of Nova Scotia,* 337 F.Supp. 62 (S.D.N.Y. 1971).[1]

▇▇▇ This conclusion is strengthened when we consider the fact that the purpose

1. We note that the 1969 district court order converting Misty's Chapter X proceeding to a Chapter XI proceeding did not prejudice the defendants below insofar as the statute of limitations is concerned. The result reached above using Chapter XI provisions would have been reached under the virtually identical provisions of Chapter X described *supra.*

of Chapter proceedings is to devise a plan whereby the debtor can, to whatever extent possible, satisfy his obligations over a period of time without resort to a conventional bankruptcy proceeding. It would thus be anomalous to construe the tolling statute so that, two years after initiation of a Chapter proceeding, a fraudulent conveyance could be recovered if, but only if, the creditors forced the debtor into bankruptcy.[2]

Since all of the results of this case may be reached under federal law, we do not discuss or reach the statute of limitations issue related to the state fraudulent conveyances law.

## III.

*Setting Aside the Fraudulent Conveyance.*

The district court concluded that the August 1966 transfer of Carson Hot Springs was fraudulent, and therefore voidable, under section 67d of the Bankruptcy Act. For the purposes of this case, fraudulence is explicitly defined by section 67d(2) of the Act. Appellants contend that the evidence adduced at trial does not support a finding of fraudulence based on any of the alternative provisions in section 67d.

a. *Intent to Defraud Misty's Creditors.*

■ Bankruptcy Act § 67d(2), 11 U.S.C. § 107(d)(2), provides in part:

Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent . . . (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.

The district court explicitly found that the August 25, 1966, transfer of Carson Hot Springs was made with actual intent to hinder, delay, and defraud the creditors of Misty. Appellants argue that the evidence does not support such a conclusion.[3]

The existence of actual fraudulent intent is a question of fact. *Prisbrey v. Noble,* 505 F.2d 170, 174 (10th Cir. 1974); 4 Collier on Bankruptcy ¶ 67.37, at 531 (14th ed. 1975). As such, the finding may be overturned on appeal only if it is "clearly erroneous." Fed.R.Civ.P. 52(a); *Williams v. Twin City Co.,* 251 F.2d 678, 681 (9th Cir. 1958).

■ We believe that the record below adequately supports the district court's conclusion. Some of the evidence adduced at trial suggested that Bates transferred the Carson Hot Springs to Tri-Aviation as part of a general plan to strip Misty of its assets, with no regard for the needs of Misty's creditors. The district court pointed out in its findings of fact that on the date of the Carson Hot Springs conveyance, Bates and Norman Doyle executed an agreement under which a new corporation was to be formed to receive all of the remaining assets of Misty. Additionally, the trial judge was in a position to evaluate the oral testimony concerning the circumstances of the transfer, and we must give considerable deference to his evaluation of the motives for the transaction. Under these circumstances, and on this record, we cannot find the district court's finding of fraudulent intent to be "clearly erroneous."

b. *Insolvency Due to Inadequate Consideration.*

Another circumstance in which a transfer will be considered fraudulent is defined by Bankruptcy Act § 67d(2)(a), 11 U.S.C. § 107(d)(2)(a):

---

**2.** Although we agree with appellants that inequities could result if a Chapter trustee is allowed to bring suit after an unreasonable length of time, this problem should not be solved through an awkward construction of the tolling statute. Instead, in an egregious case, the equitable doctrine of laches could provide the needed remedy.

**3.** The district court also made the findings, necessary under section 67d(2)(d), that the transfer occurred within one year prior to the filing of Misty's Chapter X petition and that creditors of Misty with currently provable claims existed at the time of the transfer. These findings, however, are not challenged on appeal.

Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent . . . .

The district court found that the transfer was made without fair consideration, and that Misty was thereby rendered insolvent.[4] Appellants challenge the accuracy of both of these findings, each of which is necessary to a finding of fraudulence under section 67d(2)(a).

### (1) *Fair Consideration.*

■ Bankruptcy Act § 67d(1)(e), 11 U.S.C. § 107(d)(1)(e), defines consideration to be fair "when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied . . . ." Fair consideration thus requires both "good faith" and "fair equivalence."

Whether a "fair equivalent" consideration has been given involves a number of factual determinations. The district court concluded that the consideration paid by Tri-Aviation for the Hot Springs property was $108,000. This amount represented the sum of the unpaid balance on the personal injury judgment against Langson ($90,000), plus attorney's fees paid by the Doyles to an attorney who had represented Misty in its litigation against Wyatt over title to Carson Hot Springs ($18,000). Although the personal injury judgment might arguably have been considered a personal obligation of Langson rather than an obligation of Misty, both factions seeking control of Misty apparently accepted this debt as an obligation of the corporation. In any event, no substantial challenges have been made concerning this measurement of Misty's consideration.

■ All appellants challenge, however, the district court's conclusion that the Carson Hot Springs property, at the time of the transfer was worth at least $375,000. The district court was faced with conflicting evidence on this point. An appraisal suggested that the property was worth $425,000 in 1964 (assuming good title), but evidence at trial also suggested that the value had risen considerably by 1966 due to development of nearby parcels of land. Misty's corporate balance sheet listed the property at $949,600, and Misty's 1967 bankruptcy petition listed the Hot Springs as an asset worth $815,000. At the time of the transfer, however, Wyatt's action to recover the property was still pending and Wyatt, in any event, had a vendor's lien amounting to $355,000, the unpaid balance on the purchase price. Balancing the value of the property and the existing clouds on its title, the district court arrived at the value of $375,000. This figure seems quite reasonable under the circumstances, and certainly is not "clearly erroneous," as would be necessary for a revision on appeal.

■ A discrepancy of $267,000—over seventy percent of the estimated value of the property—thus existed between the value of Carson Hot Springs and the consideration paid therefor. We have no difficulty in agreeing with the district court that a "fair equivalent" consideration was not given.

■ Nor do we have any difficulty in agreeing with the district court that the consideration for Carson Hot Springs was not given in good faith. The question of good faith is, of course, purely factual. *In Re Southern Land Title Corp.*, 474 F.2d 1033, 1037 (5th Cir. 1973). This finding is thus also reversible only if it is found to be clearly erroneous. Given such evidence as the Doyle-Bates agreement to appropriate Misty's assets and the lack of equivalent consideration for the transfer, we must uphold the district court's finding of bad faith.

---

4. As discussed *supra* note 3, additional necessary factual findings were made but are not challenged on appeal.

Under the requirements of section 67d(1)(e), then, "fair consideration" was not given for the Carson Hot Springs property.

### (2) Insolvency.

Appellants further contend, however, that even if fair consideration was not given, the transaction could not be considered fraudulent under section 67d(2)(a) because Misty was not thereby rendered insolvent. For the purposes of this case, insolvency is defined by section 67d(1)(d) of the Act as being "when the present fair salable value of [the debtor's] property is less than the amount required to pay his debts . . . ."

The evidence provides two approaches through which the district court could have concluded that the transfer rendered Misty insolvent. One approach begins with Misty's corporate balance sheet dated June 30, 1966, which was submitted to the California Department of Corporations on August 24, 1966. That balance sheet indicated that Misty's net worth was $1,335,772.82. Carson Hot Springs, however, was listed as an asset worth approximately $950,000. Misty's indebtedness to Dr. Wyatt was listed as only $90,000, whereas in reality the debt was some $355,000. Several other corporate debts ranging up to $40,000 were apparently omitted from the balance sheet, along with several small assets. Finally, the balance sheet listed two properties, representing an excess of assets over liabilities of over $200,000, as being corporate property whereas title was actually held, as of August 25, 1966, personally by Bates and Stilwell. Even though these properties were potentially recoverable as fraudulent conveyances, they should not properly be counted as assets for purposes of section 67d(1)(d) while title was not held by Misty. *See* 4 Collier on Bankruptcy ¶ 67.32, at 499–500 (14th ed. 1975).

After the indicated adjustments are made, the corporate balance sheet shows a substantial deficit, from which the district court could conclude that the transfer rendered Misty insolvent.

Alternatively, the February 22, 1967 balance sheet attached to Misty's Chapter X petition provided a basis from which Misty's insolvency as of August 25, 1966 could be shown. Such "retrojection" is permissible insofar as care is taken to account for all changes in financial position between the date of the financial statement and the date upon which insolvency is in question. *See Braunstein v. Massachusetts Bank & Trust Co.*, 443 F.2d 1281, 1284 (1st Cir. 1971). Numerous adjustments, including most of those already described above, are necessary in order to derive an accurate financial picture from the 1967 balance sheet. The result again shows, however, that the Carson Hot Springs transfer left the salable value of Misty's assets below the total of Misty's debts. The district court's finding concerning Misty's insolvency is thus supported by substantial evidence, and must be affirmed.

All of the elements required for a finding of fraudulence under section 67d(2)(d) of the Bankruptcy Act are thus present here.

### c. *Voidability as Against First American.*

Section 67d(6) of the Bankruptcy Act provides in part that:

[a] transfer made or an obligation incurred by a debtor adjudged a bankrupt under this title, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this title, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value . . . . .

This language is made applicable to Misty's Chapter XI proceeding through section 302 of the Act. Section 302 also defines a "date of adjudication" for Chapter XI proceedings, so that Misty has been effectively "adjudged a bankrupt" in the sense required to bring section 67d(6) into operation.

Since the conveyance of Carson Hot Springs was found to be fraudulent within the meaning of section 67d, it is thus voidable under section 67d(6) except as against a bona fide purchaser, lienor or

obligee for a fair equivalent value. Since neither Tri-Aviation, Lockwood, nor First American occupies the latter position, the district court properly set aside the transfer.

## IV.

### *First American's Claim to a Lien.*

■ Bankruptcy Act § 67d(6) provides in part "[t]hat such purchaser, lienor, or obligee, who without actual fraudulent intent has given a consideration less than fair . . . for such transfer, lien, or obligation, may retain the property, lien, or obligation as security for repayment." First American contends that, having surrendered Carson Hot Springs to Misty, it is entitled to a lien on the property under the above statutory language.

The district court explicitly found that First American's activities constituted participation, along with Norman Doyle, in an actual fraudulent scheme to place Carson Hot Springs beyond the reach of Misty's creditors. The district court did not find that Lockwood had such fraudulent intent in his transactions involving the property. On this record, First American contends that, notwithstanding its own fraudulent efforts to launder title to the Hot Springs, it is entitled to a lien by virtue of its position as successor to Lockwood.

The purity of Lockwood cannot cleanse First American of its fraudulent behavior. Its payments to Lockwood were pursuant to omissions from its title insurance policy which occurred because of its complicity with the Doyles in a scheme to launder title to Carson Hot Springs.

■ Bankruptcy Act § 67d(6), by its plain language, manifests an intent not to grant a preferred status to those parties who have attempted to defraud other creditors. Since First American would not have had a claim to a lien but for its fraudulent

behavior, it cannot be entitled to a lien under section 67d(6).

## V.

### *First American's Unsecured Claim.*

The district court awarded to First American an unsecured claim against the Misty estate in the amount of $162,500. This sum represented the amount which First American paid Lockwood on his title insurance policy on Carson Hot Springs, and in return for which First American received the deed to the property. Misty, as cross-appellant, contends that there is no legal basis for such a claim and that First American's fraudulent behavior precludes any right to assert a claim.

Older versions of the Bankruptcy Act did contain provisions penalizing recipients of a fraudulent conveyance. Those provisions have been eliminated, however, and the modern view is that a transferee guilty of fraudulent behavior may nevertheless prove a claim against the bankrupt estate, once he returns the fraudulently conveyed property to the estate. *See Buffum v. Barceloux Co.*, 289 U.S. 227, 237, 53 S.Ct. 539, 77 L.Ed. 1140 (1933); *Gelinas v. Buffum*, 67 F.2d 380, 382 (9th Cir. 1933); *In Re Jack Kardow Plumbing Co.*, 451 F.2d 123, 133 (5th Cir. 1971). A rule to the contrary would allow the estate to recover the voidable conveyance and to retain whatever consideration it had paid therefor. Such a result would clearly be inequitable.

The principle behind section 57g of the Bankruptcy Act, 11 U.S.C. § 93(g),[5] which allows a creditor to prove his claims once he has surrendered all voidable transfers to the bankrupt, has been described as follows:

In none of its various shapes since the Act of 1898 has subdivision g been intended to declare a forfeiture or impose a penalty. Its strictly practical approach, free from moralizing discriminations, is evidenced by the fact that it does not exclude from its application fraudulent

---

5. Bankruptcy Act § 57g provides as follows:
   The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances,

void or voidable under this Act, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances.

transfers, whether the fraud be constructive or actual . . . . The Act does not even go so far as to penalize the creditor for not surrendering voluntarily. Even if compelled by a judgment to surrender, the creditor may still . . . present his claim on a footing of equality with less recalcitrant creditors. 3 Collier on Bankruptcy ¶ 57.19, at 307-08 (14th ed. 1975).

Under these principles, First American should be allowed to prove whatever claim it would have had in the absence of its fraudulent behavior. We are thus led to the more difficult question concerning the amount of the claim a subgrantee who paid less than a fair consideration is entitled to prove, when the consideration paid by such subgrantee exceeds the consideration initially received by the bankrupt for the property in question.

Misty, it will be remembered, only received $108,000. First American acquired the property by satisfying Lockwood's claim under the policy for $162,500. We hold that First American can prove a claim of $162,500.

■ We reason in this manner. A subgrantee who surrenders property directly to a bankrupt estate has surrendered more than the equivalent of the consideration that he gave for the property. This consideration might be either more or less than the consideration paid to the bankrupt by an initial fraudulent transferee. If the subgrantee is thus to receive a "fair" compensation for the property which he surrenders, his claim must be based upon the value which he gave for the property in question.

■ This result is apparently that reached by section 67d(6) of the Bankruptcy Act, which provides that "such purchaser, lienor, or obligee, who without actual fraudulent intent has given a consideration less than fair . . . for such transfer, lien, or obligation, may retain the property, lien, or obligation as security for repayment."

Impliedly, the "repayment" to which a party is entitled is the "consideration less than fair" which he gave for the property. Moreover, while under section 67d fraudulent intent clearly bars secured status to a creditor's claim, such an intent should not alter the amount of the claim.[6] To do so would be inconsistent with section 57g.

Under these circumstances, the district court correctly allowed First American to prove a claim for $162,500 against Misty.

The judgment of the district court is thus affirmed.

AFFIRMED.

WRIGHT, Circuit Judge (concurring and dissenting):

I concur in all but Section V of the majority opinion. I would limit First American's unsecured claim to $108,000 plus interest.

Section 67d(6) distinguishes those creditors with fraudulent intent from those without it, for purposes of determining secured status. Those with fraudulent intent have no rights under Section 67d(6), but only under Section 57g. Under Section 57g, creditors may prove whatever claims they have against the bankrupt estate upon surrender of the fraudulent conveyance.

Had Tri-Aviation never laundered the Hot Springs title but simply retained it in its own name, Tri-Aviation would have had an unsecured claim for $108,000 under Section 57g, despite the presence of its fraudulent intent. First American, as subgrantee, has the same claim of $108,000 against the bankrupt estate, and has an additional claim of $54,500 ($162,500 minus $108,000) against Tri-Aviation.

Section IV of the majority opinion upholds the district court's finding that First American had actual fraudulent intent. Thus, any rights First American might have had under Section 67d(6), had it been a bona fide purchaser, are irrelevant. Since

---

**6.** There is no apparent basis within section 67d(6) upon which a distinction between the rights of an initial transferee and the rights of a subgrantee might be based. Also, section 67d(6) plainly recognizes the rights of subgrantees in that it prohibits the setting aside of a fraudulent conveyance which is held by a bona fide purchaser.

First American has no Section 67d(6) claim *against the property*, but has only a claim *on the debt*, its unsecured claim against the bankrupt estate cannot possibly rise higher than the claim of Tri-Aviation. This result should not be different merely because Tri-Aviation made, through Lockwood, what First American knew to be a worthless pledge of real property.