In re F & C SERVICES, INC., Debtor.

Herbert S. FREEHLING, as Trustee of the estate of F & C Services, Inc., Debtor, Plaintiff,

v.

Charles J. NIELSON, Nielson, Fenstermacher & Co., Inc., and Maryland Casualty Company, Defendants.

Bankruptcy No. 84–00623–BKC–SMW. Adv. No. 84–0200–BKC–SMW–A.

United States Bankruptcy Court, S.D. Florida.

Dec. 6, 1984.

Gary S. Farmer, Fort Lauderdale, Fla., Roy M. Hartman, Lauderhill, Fla., for trustee.

Chad P. Pugatch, Fort Lauderdale, Fla., for defendants, Nielson and Nielson, Fenstermacher & Co.

Joseph Rebak, Miami, Fla., for defendant, Maryland Cas. Co.

Herbert S. Freehling, Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

This Cause came on to be heard upon a complaint for turnover of property of the Debtor, to avoid a fraudulent conveyance and for damages filed herein and the Court, having heard the testimony and examined the evidence presented; observed the candor and demeanor of the witnesses; considered the arguments of counsel and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law:

This Court has jurisdiction of the parties and of the subject matter of this action by virtue of 28 U.S.C. §§ 1334 and 157.

The trustee, the plaintiff herein, challenges an attempt by the Debtor to transfer substantially all its assets to Nielson, Fenstermacher & Company, Inc. (N–F), a corporation formed by Charles J. Nielson (Nielson), the Chairman of the Debtor's Board of Directors. The basis of the trustee's challenge is that N–F is merely the alter ego of the Debtor and consequently, pursuant to Section 542 of the Bankruptcy Code, a turn over is sought by the trustee of all property of the Debtor in N–F's possession, custody and control. In addition, the trustee seeks to avoid the transfer of the Debtor's assets to N–F as fraudulent under Sections 548(a)(1) and 548(a)(2) of the Bankruptcy Code. Finally, the trustee seeks a judgment for damages against Nielson for breach of his duty to conduct the business affairs of the Debtor in good faith and with reasonable care.[1]

The factual background, while not complicated, requires a comprehensive presentation:

The Debtor began its business activities in the 1930's and was a well-established Miami insurance agency, a full service insurance business representing major insurance carriers. The insurance agency was the only business activity of the Debtor.

Through the years, the Debtor underwent a series of name changes and mergers with other local agencies. Since at least 1977, the Debtor was known as SCN or SCN Insurance to its customers and the insurance carriers which it represented. This trade name was derived from the corporate name of the Debtor at this time, namely, Stevenson-Nielson-Collingsworth, Inc. In 1982, the corporate name was changed to Stevenson, Nielson & Company, Inc. but the trade name of SCN, or SCN Insurance, continued to be used.

In the fall of 1982, the Debtor had substantial debts in the form of monthly payments due on various agreements entered into with the creditors as a result of either purchases by the Debtor of insurance agencies previously owned by the creditors or redemptions of shareholder interests held

---

1. The trustee also sought a determination of the extent of a lien or other interest in the Debtor's property claimed to be held by Maryland Casualty Company (Maryland). A resolution of this matter was reached by the parties and on August 22, 1984, the Court entered an Order Granting Voluntary Dismissal of the trustee's action against Maryland as well as a counterclaim that had been filed by Maryland against the trustee and a cross claim against Nielson and N–F.

in the Debtor. These payments were draining the cash flow of the Debtor. As of September 30, 1982, the Debtor was unable to meet its current obligations when they became due and the Debtor's financial condition did not subsequently improve. As of September 30, 1982, Nielson was the majority shareholder of the holding company for the Debtor [2], owning 60% of its shares, and was Chairman of the Debtor's Board of Directors. Fredric Fenstermacher, the president of the Debtor, owned the remaining 40% of the shares of the holding company.

At this time, a new corporation, defendant N–F, first appeared. N–F was merely a corporate shell which had been formed just months earlier by Nielson. It had no assets, business activity, employees, or operating history. In October 1982, Nielson changed the name of the corporate shell from its initial name of Charles J. Nielson, Inc. to Nielson, Fenstermacher & Company, Inc. Nielson became the majority shareholder of N–F, owning 60% of its shares, and Chairman of its Board of Directors. Mr. Fenstermacher became N–F's president and owned all the remaining shares of N–F.

At this point, according to Nielson's testimony, N–F obtained "care, custody and control" of the business of the Debtor. There was no hiatus in the business activities of the agency nor was there any change in the types of business activities pursued. The agency remained a full service insurance agency and retained the same customers and customer files as had been previously serviced under the name of Stevenson, Nielson & Company, Inc. N–F, however, maintained these files and continued to service the customers and solicit renewals of their insurance contracts under the trade name, SCN Insurance. In essence, N–F merely assumed the business

activities previously engaged in by the Debtor without revealing that it was a new entity. Not only was there no change in customers or business activities, there was no change in office address or telephone number.[3] The employees of the Debtor became employees of N–F; however, until January 1983, their salaries continued to be paid from checks drawn on the Debtor's checking account.

N–F also assumed the trade name previously used by the Debtor—SCN Insurance. Nielson readily admitted this trade name continued to be used in order to preserve the strong identity previously developed by the Debtor with its customers and the insurance carriers it represented. In fact, during cross-examination, Nielson acknowledged that N–F and the Debtor "were the same people" and were like "two parties who were living together." The trade name was contained on all stationery and business cards of N–F, while the name Nielson, Fenstermacher & Company, Inc. was conspicuously absent. Neither the customers nor creditors of the Debtor were told of this change.

However, the insurance carriers were told of merely a "name change" to N–F. A review of various letters sent to insurance carriers by Nielson to request a change in the agency contracts then between the carriers and the Debtor clearly indicates that Nielson represented to the carriers that the agency had undergone yet another name change but that business would continue as usual. None of these letters even mentions a purchase by N–F of any of the Debtor's assets much less its book of business.

Business continued as usual with the agency but merely under a different name. There was no difference in the customers represented by the insurance agency when

2. The holding company, SCN Insurance, Inc., owned all the shares of the Debtor at this time.

3. When the operating entity of the insurance agency, N–F, moved its offices in mid-December 1982, the announcement indicated both SCN Insurance and the Debtor were relocating to the new offices. No mention of N–F by name was

made. The Debtor and N–F, operating under the trade name of SCN Insurance, continued to occupy the same address throughout 1983 and *both* had the same Miami telephone number. There was never a telephone listing for N–F by name but only a listing under SCN Insurance.

it was known as Stevenson, Nielson & Company, Inc. from those customers initially represented by the agency when it became known as N–F. It is apparent that a single business activity was involved, namely, a full service insurance agency, and that N–F merely continued the activities of the Debtor in this field, namely, servicing the clients' needs and soliciting their renewals.

Nielson admitted that the source of the assets and business activities of N–F was derived from the balance sheet assets of the Debtor and the business activities the Debtor had pursued as an insurance agency. Yet, no consideration was paid by N–F to the Debtor for the latter's cash, accounts receivable due from customers, or the notes receivable due it. According to the testimony of Janette Ericksen, the treasurer of N–F, a bookkeeping entry was merely performed in November 1982 to reflect accounting entries as of October 1, 1982 whereby the balance sheet assets of cash, accounts receivable and notes receivable were "transferred" to N–F's books from those of the Debtor. No written agreement was ever executed to reflect any sale or transfer of these assets nor were notes payable to the Debtor negotiated to N–F. The "transfer" was between companies wholly controlled by Nielson, who remained in control of both entities after the transfer in question and continued in control of each when the petition commencing this case was filed.

Some of the liabilities of the Debtor were reflected in the accounting records of N–F as having been assumed by it. These liabilities were those due the insurance carriers for the policy premiums paid by the customers of the agency. Nielson admitted that these liabilities continued to be paid in the manner they had always been paid, namely, from the business operations of the insurance agency.

While all the assets of the Debtor were transferred to the "care, custody and control" of N–F, knowledge of the very existence of N–F was kept from the creditors owed monies by the Debtor on the various agreements for one year or longer. Yet, for a time, the business operations of the agency continued to pay the debts incurred on these obligations. Monies were transferred from the operating entity, N–F, to the checking account of the Debtor from which checks were drawn to pay the creditors through August 1983. One creditor testified that he presumed the income generated by the business operations of the Debtor was the source of the payments. It is logical to infer that the other creditors assumed this as well since none of them were told of the existence of N–F during this one year period or that the Debtor had ceased business operations.

In the summer of 1983, Nielson performed an analysis of the debts of the Debtor, including those to creditors to which he had given personal guarantees of payment. Deciding it was no longer advantageous to pay the creditors on their agreements, Nielson told creditors, in mid-September 1983, that he had transferred all the assets of the Debtor to N–F leaving the Debtor with over $1 million of debts and no ability to pay those debts. Nielson also advised them that they could sue but that it would be useless. The only creditors paid after September 1983 were those to whom Nielson had given personal guarantees, and these payments came directly from N–F's checking account. Other creditors agreed to continue moratoria of their payments at the insistence of Nielson.

With payments no longer being made to the majority of the creditors,[4] the Debtor's name was changed to F & C Services, Inc. and its address moved to Hollywood, Florida admittedly in order to avoid any adverse publicity associated with any bankruptcy filing. Thereafter, on April 3, 1984, the Debtor filed a voluntary petition under Chapter 7.

---

4. Yet, payments to the trade creditors (the insurance carriers) continued in order to maintain the operations of the insurance agency.

The admitted purpose of the formation of N–F was, in Nielson's own words, "to have control over who is paid when". It is evident that Nielson intended to rearrange the assets and debts of the Debtor so as to be able to have control over which creditors were paid and when. In fact, Nielson conceded during cross-examination that "we're not kidding anybody about why we did what we did" and that as to the existence of N–F and the Debtor that "we're the same people" and "two parties who were living together."

### A. *Alter Ego*

■ It is well established that property of the Debtor in the possession, custody and control of its alter ego comprises property of the estate at the commencement of the case. 4A *Collier on Bankruptcy* ¶ 70.15 at 138–139 n. 14 (14th ed. rev. 1978) (power of the Bankruptcy Court in the exercise of its equitable jurisdiction to disregard corporate entities where a corporation is no more than the alter ego of the bankrupt so as to treat the bankrupt's trustee as titleholder of the alter ego's property) and cases cited therein. *See also In re Crabtree,* 39 B.R. 718, 11 B.C.D. 1075, 1078 (Bkrtcy.E.D.Tenn.1984) (bankruptcy court has the power to disregard separate corporate entities to reach assets to satisfy debts of the bankrupt corporation from assets of its non-debtor alter ego) and cases cited therein.

■ In the words of Judge Henry Friendly in *United States v. Benjamin,* 328 F.2d 854, 863 (2d Cir.1964), the misuse of the corporate form "can be an instrument for inflicting pecuniary loss more potent than the chisel or the crow bar" [cited with approval in *In re Himoff Enterprises, Ltd.,* 22 CBC 36, 52 (Bkrtcy.S.D.N.Y.1979) (assets of an alter ego of the Debtor ordered turned over to bankruptcy trustee to rectify a corporate wrongdoing and to retrieve for the creditors what was theirs)]. In Florida, the rule is that a corporate veil will be pierced where it is shown that the corporation was organized or used for an improper purpose such as to mislead credi-

tors. *See Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So.2d 1114, 1121 (Fla.1984). An actual fraud need not be perpetrated upon the creditors as a prerequisite to piercing a corporate veil. A corporate entity will be disregarded in order to prevent injustice to creditors.

■ Where principals of a debtor attempt to transfer corporate assets to a newly created corporate entity, which they also control, the transaction is fraudulent when the new corporation is a mere continuation of the debtor, controlled by the same persons, and made up essentially of the same assets and resources as the old corporation. *Florida Brogdex Distrib., Inc. v. Hulsey,* 103 Fla. 723, 138 So. 728 (1931).

> The fraudulent nature of the transaction may be found to exist in the transfer of assets of a corporation without consideration or for grossly inadequate consideration to a successor corporation to the prejudice of creditors for the benefit of the same individuals who constitute the beneficial owners of each of the corporations involved.

138 So. at 730.

■ Fraud will be presumed when the transfer occurs between two corporations controlled by the same officers and directors. *J.I. Kelly Co. v. Pollack,* 57 Fla. 459, 49 So. 934, 935 (1909). This is especially appropriate where a principal (here Nielson) of the successor corporation (here N–F) admitted he had actual notice of the fact that the debtor corporation (here Stevenson, Nielson & Company, Inc.) was insolvent at the time of the transfer as well as the fact that the debtor corporation had substantial debts which in this case amounted to approximately $600,000 to insurance carriers and over $1,000,000 to the creditors herein. As in *J.I. Kelley Co.,* Nielson was on notice that any transfer of the Debtor's book of business, virtually its sole revenue producing asset, would leave the Debtor with no means to pay the indebtedness to the creditors. Under similar circumstances, the court in *J.I. Kelley Co.* stated:

When the legal effect of a conveyance is to hinder or delay creditors, the intent [to defraud] will be presumed, regardless of the actual motives of the parties.

*Id.* at 935. *See also McKeown v. Allen*, 37 Fla. 490, 20 So. 556 (1896); *Barnes v. Liebig*, 146 Fla. 219, 1 So.2d 247, 254 (1941); *Bellaire Securities Corp. v. Brown*, 124 Fla. 47, 84, 168 So. 625, 633 (1936). *Cf. National Carloading Corp. v. Astro Van Lines*, 593 F.2d 559 (4th Cir.1979).

■ In *Astro Van Lines*, as in this case, the debtor corporation and transferee corporation were both controlled by the same individual. The transferee purchased the only valuable asset of the debtor, its ICC certificate to operate an interstate moving company (namely, its right to do business), at a time when the debtor was in financial difficulty leaving it with neither money nor property nor operating ability nor ability to pay its debts. Even without the transferee and the debtor having overlapping ownership, the court found

the mere circumstances of the transaction would be enough to give [the transferee] ... notice ... [since] "... where a corporation transfers all its assets to another corporation with a view of going out of business, and nothing is left with which to pay its debts, such transferee is charged with notice by the very circumstances of the transaction, and takes the same cum onere."

*Id.* at 562. *See also Williams v. Commercial Nat'l Bank*, 49 Or. 497, 90 P. 1012, 1015, 91 P. 443 (1907). The law will not permit a transaction between two corporations to remain valid "... when the negotiators for both corporations are the same or virtually the same, and the transfer of assets is made merely for their own convenience and advantage." 19 Am.Jur.2d, *Corporations* § 1551 at 926–27 n. 4 (1965), citing *Avery v. Safeway Cab Transfer & Storage Co.*, 148 Kan. 321, 80 P.2d 1099 (1938).

■ Once an actual intent to hinder, delay or defraud creditors is established by *prima facie* evidence, the burden of proof to demonstrate the transfer was not fraud-

ulent rests upon the transferee. *See McKeown v. Allen*, 37 Fla. 490, 20 So. 556 (1896). *See also Barrie v. United Rys. Co. of St. Louis*, 125 Mo.App. 96, 102 S.W. 1078, 1084–85 (1907). This presumption of fact can be overcome "by clear and convincing proof that the officers and directors acted with *impartiality* and *absolute fairness*, so that *no* advantage was given one corporation over the other...." *Id.* 102 S.W. at 1085 [Emphasis Added] and cases cited therein. *See also Johnson v. United Rys. Co. of St. Louis*, 281 Mo. 90, 219 S.W. 38 (1920) (transfer of assets from insolvent corporation to another corporation having same officers and virtually identical directors and shareholders was *utterly void* as to insolvent corporation's creditors and the assets transferred constitute a trust fund for payment of said creditors.)

■ In this case, Nielson claims he was left with no alternative but to "transfer" the Debtor's book of business to N–F lest the creditors received nothing. However, the transfer clearly left the Debtor without any means to pay the creditors and no provision was made to insure satisfaction of their debts by N–F. This was not an arms-length transaction to a bona fide purchaser for value. Under these circumstances, an actual intent to defraud the creditors is established as a matter of law.

While business appeared to continue as usual at the insurance agency, it was really N–F which received the income from those activities. The income derived from the insurance agency was then transferred to the Debtor's checking account from which checks were drawn made payable to the creditors. Thus, the creditors were misled by the receipt of funds from the Debtor and could reasonably infer that the business activities of the Debtor produced the monies paid to them. In addition, Nielson stripped the assets of the Debtor leaving it with liabilities in excess of $1 million and no means to repay those debts.

It was only after Nielson decided it was no longer advantageous to continue to pay the creditors were any of the creditors told

of the purported transfer of the assets of the Debtor to N–F. Thereafter, beginning in the fall of 1983, Nielson paid only those creditors to whom he had given personal guarantees of payment. These payments came directly from the checking account of N–F. Yet, not until March 1984 was there any written agreement between the two corporations whereby any assets of the Debtor were sold to N–F.

■ Under these circumstances, it is indeed appropriate to find N–F implicitly, if not expressly, assumed the debts owed to the creditors. *See, e.g., Mallory S.S. Co. v. Baker & Holmes Co.,* 117 Fla. 196, 157 So. 504 (1934). Under these facts, it is also well recognized that N–F is estopped from disclaiming liability for these debts. *See, e.g., Harbison-Walker Refractories Co. v. McFarland's Adm'r,* 156 Ky. 44, 160 S.W. 798, 801–02 (1913); *Wilson & Toomer Fertilizer Co. v. American Cyanamid Co.,* 33 F.2d 812 (5th Cir.1929) (transferee estopped from denying its continued obligation to comply with service contract after it had acquired all the assets of transferror and performed the obligations under the contract for two years thereafter).

Based upon the evidence elicited during the trial, N–F is merely a continuation of the Debtor. There was no change whatsoever in the nature or the extent of the business activities of the insurance agency. The two operations were so integrated through a commingling of funds and common supervision that is indeed appropriate to consider them as one integrated enterprise. In fact, Nielson admitted the alter ego nature of N–F when he represented to insurance carriers that the insurance agency had merely undergone a "name change" from Stevenson, Nielson & Company to N–F, but that agency business would be continued in the same manner as in the past.

The attempt to create a separate corporate structure not only concealed the existence of N–F so as to hinder, delay and defraud the creditors, but actually worked a substantial injustice upon them. The Debtor was left with no assets to satisfy the debts owed to these creditors. The corporate structure of N–F was misused in order to avoid payment by Nielson and N–F of these debts. The creditors were left with an empty shell corporation in bankruptcy, with no assets, no business and no future prospects, while Nielson and N–F have taken all the assets and business and continue to operate as a viable insurance agency in Miami. Based upon all of the evidence adduced at trial and the authorities cited above, the Court, sitting as a court of equity, must correct the injustice that has been perpetrated on the creditors and find that N–F is the alter ego of the Debtor. *See also Thomson v. L.C. Roney & Co.,* 112 Cal.App.2d 420, 246 P.2d 1017 (1952) (alter egos found where there were a mere change of name and shift of assets whereby "new" corporation was, in reality, but a continuation of the old); *State Bd. of Admin. v. Pasco County,* 156 Fla. 37, 22 So.2d 387 (1945) (alter egos found when "new" corporation formed by shareholders and officers of old one and the "new" corporation took over the business and assets of the old one and paid its debts).

■ The Court finds that the Debtor's assets and property, now held by N–F as its alter ego, are property that the trustee could use, sell or lease pursuant to Section 363 of the Bankruptcy Code and are not of inconsequential value or benefit to the estate. Consequently, the Trustee is entitled to as turnover of all property of N–F as property of the Debtor's estate under Section 542 of the Bankruptcy Code.

### B. *Section 548(a) Fraudulent Transfer*

In his complaint, the trustee sought alternative relief to avoid the transfer of the Debtor's assets to N–F as fraudulent as Sections 548(a)(1) and 548(a)(2) of the Bankruptcy Code. Common to both these subsections of Section 548(a) is that there must be a transfer of the Debtor's property within one year of the date the petition commencing this case was filed. Defendants Nielson and N–F have not disputed that a transfer of the Debtor's property occurred,

only that the transfer occurred within this one year period.[5]

The Court finds the transfer occurred within one year of the filing of the petition. The only credible evidence concerning the date of the transfer is the March 26, 1984 agreement drafted by Nielson and the testimony of Mr. Fenstermacher. According to Mr. Fenstermacher, no sale of the Debtor's book of business to N–F was contemplated until September or October 1983. Nielson testified that N–F retained "care, custody and control" of the book of business, namely, to "service the renewals." Nielson also conceded on several occasions during cross-examination that no written sales agreement for the expirations was drafted and executed until March 26, 1984 and then only at the urging of Maryland Casualty Company, a major insurance carrier represented by both the Debtor and N–F and a creditor of the Debtor, and after Mr. Fenstermacher had resigned as president of the Debtor and N–F.[6]

Nielson, however, claimed that the Debtor's book of business was transferred to N–F outright as of October 1, 1982. Nielson's self-serving statements are incredulous when all the evidence is reviewed. First, in an amendment to the Debtor's statement of affairs, Nielson certified under penalty of perjury that the transfer of the expirations to N–F occurred within one year of the filing of the voluntary petition by the Debtor. Second, the purchase and sales agreement admittedly drafted by Nielson states in no uncertain terms that

N–F "... purchased the assets (expirations) of the seller [the Debtor] *effective December 31, 1983."* The agreement merely states that N–F "serviced" the expirations during the fiscal year from October 1, 1982 to October 1, 1983. Third, both Nielson and Mr. Fenstermacher admitted that the monies transferred by N–F to the Debtor during that year were reflected as being "loaned" to the Debtor and not as payments for any assets purchased. Fourth, the purported board of directors minutes of the Debtor dated October 3, 1982, if genuine, reflect that N–F was only to have "care, custody and control of all customer account including accounts receivable, accounts payable and to assume servicing responsibilities" while the Debtor was "seeking a purchaser for the business" and only *"[i]f by October 2, 1983, the book of business ... [had] not been sold by [the Debtor] ..., effective December 31, 1983 ...* [would an agreement] be reduced to writing thereby giving ownership of expirations to ..." N–F.[7] Fifth, Nielson admitted the accuracy of a letter he wrote to a Mr. John Mitchell on October 25, 1983 in which he represented that the assets of the Debtor *would* be transferred to Charles J. Nielson, Inc., a newly formed corporation. From a review of all the evidence, the Court finds that the expirations were not acquired by N–F until within one year of the filing of the voluntary petition by the Debtor.

Once a transfer of the Debtor's property has been found to have occurred

---

5. Alternatively, the trustee sought leave to amend the pleadings to conform to the evidence to avoid the transfer pursuant to Section 544(b) of the Bankruptcy Code and Section 726.01, Florida Statutes, in the event the transfer was found to have occurred outside the one year period. Since the Court finds *infra* the transfer did occur within one year of the filing of the petition herein, the trustee's motion is deemed moot.

6. In this regard, the book of business representing insureds of Maryland was not assigned to N–F by the Debtor until March 30, 1984, just four days prior to the filing of the voluntary petition herein.

7. Mr. Fenstermacher testified that he had access to the minute book but never saw these alleged minutes. Further, he testified he never attended the board meetings reflected in these minutes and no directors meetings would have occurred without his knowledge. Further, Gloria McClure, a former secretary employed by N–F, testified that she typed these minutes in approximately April 1984 at the request of Nielson who stated the dates of the alleged meetings were accurate although the meetings would have occurred approximately one and one-half years earlier. While there is substantial doubt as to validity and accuracy of these minutes, they are relevant to refute Nielson's claims that the expirations were purchased by N–F effective October 1, 1982.

within one year of the filing of the petition, Section 548(a)(1) permits the trustee to avoid the transfer if the Debtor made such transfer with actual intent to hinder, delay or defraud any of its creditors. By necessity, fraudulent intent is not easily susceptible of direct proof. As stated by the court in *In re Vecchione*, 407 F.Supp. 609, 615 (E.D.N.Y.1976),

> [t]he analysis begins with the statement of the obvious. Persons whose intention is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose. Instead, if their intent is to be known, it must be gleamed from inferences drawn from a course of conduct. *In re Saphire*, 139 F.2d 34, 35 (2 Cir.1943); *In re Freudman*, 362 F.Supp. 429 (S.D.N.Y.1973), *aff'd*, 495 F.2d 816 (2 Cir.1974).

A general scheme or plan to strip the Debtor of its assets with no regard to the needs of the creditors can support a finding of actual fraudulent intent. *See, e.g., Misty Management Corp. v. Lockwood*, 539 F.2d 1205 (9th Cir.1976); *Jackson v. Doris Sprinkler Corp.*, 4 B.C.D. 251 (8th Cir. 1978). A "clear pattern of purposeful conduct" will support "a finding of actual intent to defraud". *See In re Freudmann*, 495 F.2d 816, 817 (2d Cir.), *cert. denied sub nom. Freudmann v. Blackstein*, 419 U.S. 841 (1974). As recognized by *Collier*,

> [t]he finding of the requisite intent may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent. Rarely will a fraudulent transferor disclose his fraudulent intent in a mode capable of direct proof. Unless [Section 548(a)(1) ] ... is to have a severely restricted scope, it would seem to cover cases where the Trustee shows that the transferor acted under circumstances that preclude any reasonable conclusion other than the purpose of the transfer was fraudulent as to its creditors.

4 *Collier on Bankruptcy* ¶ 548.02[5] at 548-33-34 (15th ed. 1984).

In this regard, certain badges of fraud can form the basis for a finding of actual intent to hinder, delay or defraud. These badges of fraud include (1) concealment of facts and false pretenses by the transferor, (2) reservations by the transferor of rights in the transferred property, (3) the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor, and (4) the creation of a closely held corporation to receive the transfer of the property in question. *Id.* at 548-34-38. In essence, where the transferee is in a position to dominate or control the Debtor's disposition of his property, the transferee's intent to hinder, delay or defraud creditors may be imputed to the Debtor. *Id.* at ¶ 548.02; *In re Roco Corp.*, 15 B.R. 813, 817 (D.R.I.1981).

The Court has found above that N–F is the alter ego of the Debtor and that N–F was created and used solely to continue the business activities of the Debtor. To conceal the existence of N–F, the trade name previously used and identified by the Debtor since 1977 was taken by N–F. All the stationery and business cards of N–F did not bear its name but only the trade name SCN Insurance or SCN. Nielson and Mr. Fenstermacher, who controlled the day to day operations of the Debtor, remained in control of the daily activities of N–F. Yet, the creditors of the Debtor continued to be paid from the checking account of the Debtor. It was entirely reasonable for the creditors to presume that the business activities of the Debtor had remained unchanged.

Having determined in the summer of 1983 that he would no longer pay any creditors to which he had not given personal guarantees of payment, Nielson began to disclose to some of the creditors the fact that the Debtor no longer had the financial ability to pay them. In September 1983, Nielson told a creditor that he had transferred all the assets of the Debtor to N–F and that he could not legally reach those assets. In addition, Nielson admitted the

Debtor was unable to satisfy any judgment that would be rendered in favor of another creditor who had instituted legal action against the Debtor. Finally, Nielson admitted during cross-examination at trial that "he was not trying to kid anybody about why he did what he did." What Nielson attempted was to transfer the operational assets of the Debtor and only the liabilities necessary to insure the insurance agency would continue to function leaving the Debtor with liabilities of over $1 million on the agreements with the creditors.

The facts found above are indicative of badges of fraud being present herein. The transfer of the operational assets of the Debtor to N–F was concealed for upwards of one year or more from the creditors. The Debtor, however, reserved rights in the transferred property since N–F, by Nielson's own admission, merely had "care, custody and control" of the book of business during this one year period of time. No sale of the book of business was even contemplated to N–F until September 1983 much less reduced to writing until March 26, 1984. The transferee, N–F, clearly dominated the activities of the Debtor since N–F and Nielson determined which debts of the Debtor would be paid and when. N–F was created and used by Nielson, the majority shareholder and chairman of the board of directors of the Debtor, to receive the transfer of the property in question. Finally, there was an unconscionable discrepancy between the value of the property transferred and the consideration received.

Both the purported minutes of the board of directors meetings of the Debtor and the March 26, 1984 purchase and sales agreement value the expirations to be sold to N–F at 1.5 times the previous twelve months of commission income for the agency. Both documents are unambiguous on their face; the purchase price for the expirations was to be calculated at 1.5 times the previous twelve months of commission income for the agency. For the fiscal year ending September 30, 1982, the Debtor had commission income of approximately $1,190,000. Consequently, the value of the expirations would be no less than $1,785,-000 (1.5 times commission income). Similarly, the commission income for the agency was approximately $1,040,000 the fiscal year ending September 30, 1983. The value of those expirations would be $1,560,000 (again 1.5 times commission income).

Nonetheless, at trial N–F argued for the use of a retention formula, which considered only that commission income associated with the expirations actually renewed and *not* all the commission income for the previous twelve months. A retention formula was not contemplated by the Debtor and N–F in their March 26, 1984 agreement. Actually, the use of a retention formula was an attempt by Nielson to claim a reduced value for the expirations eventually acquired by N–F. It was only when the propriety of the transfer of the expirations from the Debtor to N–F was questioned before this Court that Nielson disclaimed the previous valuation he placed upon those expirations.

N–F, being the alter ego of the Debtor, in reality did not pay any consideration for the expirations in question, although it did give $842,000 to the Debtor from the business operations. N–F merely continued the business operations of the insurance agency whose existence dates to the mid-1930's. The income derived from these business operations was used to meet not only the operational expenses of the agency but also for a period of time the obligations owed to the creditors. When Nielson decided he no longer wished to pay these latter obligations, he ceased doing so. Thereafter, the Debtor was placed in bankruptcy.

 The Court finds that N–F was created and the Debtor's property transferred to N–F with an actual intent to hinder, delay and defraud the creditors of the Debtor. The Debtor was intentionally stripped of its ability to pay the creditors. Pursuant to Section 548(a)(1) of the Bankruptcy Code, this Court will avoid the transfer of the assets of the Debtor to N–F as fraudulent.

The Court can also avoid the transfer of the Debtor's property as fraudulent under Section 548(a)(2) of the Bankruptcy Code. Section 548(a)(2) permits the trustee to avoid any transfer of the Debtor's property made within one year of the filing of the petition if the Debtor

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; [or]

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; . . . .

Nielson caused the Debtor to be stripped of its ability to continue in business and placed care, custody and control of all its assets, and subsequently transferred those assets, to N–F. Included among these assets, was the book of business or expirations of the Debtor, by far its largest and most valuable asset, from which it conducted its business. The Debtor was left with absolutely no assets while having liabilities in excess of $1,000,000 and thus was rendered insolvent by the transfer.

■ Although the value of the expirations as of September 30, 1983, was approximately $1,560,000 only about $842,000 or approximately 54% of this value, was physically placed in the Debtor's checking account and was subsequently used by the Debtor. Thus, reasonably equivalent value was not paid for the expirations by N–F and Nielson. Consequently, any transfer of the assets from the Debtor to N–F was also fraudulent under Section 548(a)(2). *See e.g., In re Vaniman Int'l, Inc.,* 22 B.R. 166 (Bkrtcy.E.D.N.Y.1982). *See also J.I. Kelly Co. v. Pollack,* 57 Fla. 459, 49 So. 934, 935 (1909); *National Carloading Corp. v. Astro Van Lines,* 593 F.2d 559 (4th Cir.1979).

## C. *Breach of Fiduciary Duty by Nielson*

■ Finally, Nielson breached his fiduciary duties as a director and officer of the debtor by failing to safeguard assets of the Debtor and by engineering the fraudulent transfer. Section 607.111(4), Florida Statutes, provides that:

A director *shall* perform his duties as a director, . . . *in good faith,* in a manner he reasonable believes to be in the *best interests* of the corporation, and with such care as an ordinary, prudent person in a like position would use under similar circumstances.

[Emphasis Added]. By definition, a breach of this fiduciary duty can occur by negligent conduct. Since Nielson failed to safeguard the assets of the Debtor as well as engineered a fraudulent transfer for his own personal advantage, he breached his fiduciary duty to act in good faith and in the best interests of the Debtor and he can be held liable for the damages incurred by his breach of trust to the Debtor. *See generally* 8 Fla.Jur.2d *Business Relationships* § 296, *et seq.* (directors' and officers' fiduciary status); §§ 388–90 at 489–491 (fiduciary status for directors and officers of insolvent corporations).

With knowledge that the Debtor was insolvent, Nielson caused the entire book of business and all other assets of the Debtor to be handed over to the care, custody, control and possession of N–F, a shell corporation, with no previous business or history, which Nielson owned and controlled. The Debtor's business had an expectation of over $1 million in commission income during the ensuing fiscal year. At the time N–F obtained care, custody and control of the book of business, the previous twelve months of commission income was about $1.2 million. There was, therefore, the means available to the Debtor to attempt to reduce the liabilities it had incurred. Nielson, however, stripped the Debtor of all its assets and consequently its ability to effectively meet its obligations in the future was destroyed. Not only were the means to continue its business taken away from the

Debtor, Nielson caused only approximately 50% of the value of the assets to be paid to the Debtor for the expirations. Furthermore, this value which N–F claims to have paid came from the continuing operations of the agency, which is money belonging to the Debtor in the first place and cannot be viewed as value paid by N–F.

In essence, Nielson attempted to derive a private profit from the transfer of the expirations of the Debtor to N–F. The transfer left the Debtor not only without fair value being paid for these assets but also the clear inability to continue to meet the obligations to its creditors. The value of N–F, previously a shell corporation owned by Nielson, was enhanced by the transfer of these valuable assets to it. N–F virtually clothed itself with the trade name and operating history of a longstanding, historically viable business entity, leaving the Debtor, and the creditors in its wake. This willful misapplication of corporate assets by Nielson, who was still an officer of the Debtor owing it a fiduciary duty, was constructive fraud per se, and resulted in the inevitable consequence of bankruptcy of the Debtor.

Nielson has attempted to immunize these assets from the reach of the creditors herein. His participation in the transfer of the Debtor's property while the Debtor was insolvent to another corporation which he controlled is a breach of the fiduciary duties Nielson owed to the Debtor. *See, e.g., Guaranty Trust & Savings Bank v. United States Trust Co.,* 89 Fla. 324, 103 So. 620 (1925) (directors of an insolvent corporation occupy a fiduciary relationship toward creditors and are charged with managing the corporation's assets for the best interests of creditors) citing *Beach v. Williamson,* 78 Fla. 611, 83 So. 860, 9 A.L.R. 1438 (1919); *Skinner v. Hulsey,* 103 Fla. 713, 138 So. 769 (1931). *See also Robinson v. Watts Detective Agency,* 685 F.2d 729, 736–737 (1st Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983); *In re Folliard,* 10 B.R. 875 (Bkrtcy. D.Md.1977) (even if a corporate officer did not profit from the transaction, if he knowingly causes the misappropriation of corporate property then the officer is personally liable for his breach of trust to the corporation). Consequently, the Trustee is entitled to a judgment for damages against Nielson for the difference in the amount of consideration arguably paid by N–F for the expirations in question ($842,000) from the true value of the assets transferred ($1,560,000), namely, $718,000.00.

A separate Final Judgment will be entered in accordance with these findings of fact and conclusions of law.